CHARLES EMERSON HUNT, non compos mentis, by next friend, Dorothy Ann Hunt Phillips, Appellant, v. MARIE SOMMERS HUNT and A. V. McDOWELL, Guardian of Charles Emerson Hunt, Jr., Appellees.
—412 S.W.(2d) 7.

Western Section. September 3, 1965.

Rehearing Denied October 6, 1965.

Certiorari Denied by Supreme Court, March 21, 1966.

684

Taylor & Taylor, Memphis, for appellant.

Olen C. Batchelor, Jr., Allen Gardner, Memphis, for appellee, Marie S. Hunt.

A. V. McDowell, Memphis, guardian of Charles E. Hunt, Jr., appellee.

CARNEY, J   The appellant, Mrs Dorothy Ann Hunt Phillips, brought suit as next friend of her brother, Charles Emerson Hunt, Jr, a non compos mentis, to annul his marriage to the defendant, Marie Sommers Hunt. The marriage was solemnized on July 18, 1958, at Bellevue Baptist Church Chapel in Memphis, Tennessee. The bill for annulment was filed November 21, 1963. His Honor the Trial Judge, without a jury, held: (1) That Mrs. Phillips as next friend had no standing to bring the

suit since there was a legal guardian, defendant A. V. McDowell, authorized to act in behalf of the non compos mentis, Charles Emerson Hunt, Jr., and he had not joined in the suit seeking to annul the marriage; (2) that Mrs. Phillips' action was barred by laches and estoppel; (3) that on the merits of the case, the ward, Charles Emerson Hunt, Jr., had lucid moments at the time of his marriage in July, 1958, and thereafter and that he sufficiently understood the contract of marriage which he entered into and that the marriage was valid. Mrs. Phillips has appealed and has made some nineteen assignments of error.

Solicitors for appellant quite candidly state that the two principal questions to be decided by this court on this appeal are: (1) Was Charles Emerson Hunt, Jr., mentally incompetent to enter into a valid marriage with the defendant, Marie Sommers, on July 18, 1958; and (2) may an insane person maintain a suit by next friend to annul his marriage where his regular guardian refuses to act?

Charles Emerson Hunt, Jr. is approximately 50 years of age and is now in Western State Hospital at Bolivar, Tennessee, a mental institution. Mr. Hunt sustained a prenatal or natal injury resulting in what the doctors call a chronic brain syndrome. He is a spastic with deformed feet, hands, face and tongue. He walks and talks with difficulty.

His father was engaged in the retail furniture business in Memphis, Tennessee, as well as in other West Tennessee towns. He had two children, Charles Emerson Hunt, Jr. and the next friend, Dorothy Ann Hunt Phillips. Charles Emerson Hunt, Jr. attended school until about the tenth grade He stayed around his father's furniture store until after his father died in 1945. His mother died

in 1951. Charles Emerson Hunt inherited and received by gift from his father and mother approximately $40,000. He managed his own financial affairs without legal guardian until April 11, 1961, when the Chancery Court of Shelby County, Tennessee, adjudged him an incompetent and appointed the First National Bank of Memphis as conservator.

The application for a conservator was made by the defendant, his wife, Marie Sommers Hunt. From July 18, 1958, until May 17, 1962, Charles Hunt lived at his home on Summer Avenue in Memphis, Tennessee, with his wife, Marie Sommers Hunt, and her children by a former marriage. On May 17, 1962, upon application of his next friend and sister, Mrs. Dorothy Ann Hunt Phillips, Charles Hunt was committed to Gailor Psychiatric Hospital by the Probate Court of Shelby County, Tennessee, where he remained until August 10, 1962, at which time he was adjudged to be fully non compos mentis with paranoid tendencies and committed to Western State Hospital at Bolivar, Tennessee. He was confined at Bolivar at the time of the trial on October 27, 1964. However, from time to time Charles Hunt is permitted to leave Western State and go to Memphis to visit his wife for week ends, etc. Oftentimes he makes the trip alone by bus. He was confined primarily because he wrote a number of pornographic letters to the President of the United States.

On September 9, 1963, upon the petition of Mrs. Dorothy Ann Hunt Phillips as next friend, A. V. McDowell, a member of the Shelby County Bar, was appointed regular guardian of Charles Emerson Hunt, Jr. by the Probate Court of Shelby County, Tennessee. Mr. McDowell assumed full possession of all the property of his ward, Charles Emerson Hunt, Jr., which amounted to approxi-

mately $125,000. Mrs. Phillips requested the guardian to file suit for annulment of the marriage of Charles Emerson Hunt to defendant Marie Sommers Hunt. The guardian refused to do so. Thereupon on November 21, 1963, Mrs. Phillips, as next friend, filed the original bill for annulment in the Circuit Court of Shelby County making Marie Sommers, wife of Charles Emerson Hunt, a defendant and also naming A. V. McDowell, guardian of Charles Emerson Hunt, Jr., party defendant. The guardian filed a formal answer admitting the mental and physical disabilities of the ward but stating in substance that he did not know whether Charles Emerson Hunt, Jr. was competent or incompetent to make a valid marriage and that the question should be determined by the court and not by the guardian.

We turn first to the assignment of error challenging the decision of the lower court that Mrs. Dorothy Ann Hunt Phillips could not legally bring this suit as next friend of her brother, Charles Emerson Hunt, because there was a regular guardian, the defendant A. V. McDowell.

Concerning suits by next friends Mr. Gibson has the following to say:

"Sec. 111. Next Friends, Generally Considered.—A next friend, or, as he is frequently termed, a prochein ami, is a sort of self-appointed guardian who assumes the duty and responsibility of bringing a suit in behalf of a person under some disability, legal or natural. The person thus under disability, is generally (1) a minor. or (2) a person of unsound mind. These persons not being able to bind themselves by contract for costs of suit, and, in case of minors and persons of unsound mind, not being of sufficient mental capacity and business experience to comprehend their rights and how to

protect them, it becomes necessary for some friend to intervene in their behalf, whenever their interests require the interposition of a Court. This friend is called the next friend, because formerly he was the nearest (or next) kinsman of the person under disability. But, now, any person may act as next friend, provided he is acting in good faith, and secures costs.

The object of the rule requiring a next friend in the prosecution of suits for the benefit of persons under disability, is to have someone responsible for costs and liable to judgment therefor; and to have someone upon and against whom the Court may make and enforce its orders, and who will be subject to punishment for contempt in case of disobedience to, or violation of, the mandates of the Court; and for the more especial purpose of having someone before the Court capable of looking after and caring for the interests of those incapable of understanding and defending their own rights.

It is the duty of a next friend seduously to watch and protect the interests of his ward involved in the litigation. He is, in the conduct of the suit, subject to the control of the Court; and if he fail to do his duty, or if any other sufficient ground be brought to the knowledge of the Court, as, if he have an interest in the litigation antagonistic to the interests of his ward, the Court not only has the power, but it is its duty, to remove him, and appoint another, who may be more faithful, or not subject to a similar temptation.

Were the rule otherwise, the ends of justice might be defeated, and iniquities perpetrated by a party, whose interests are antagonistic to those of his ward, assuming the office of next friend, and bringing his ward

before the Court, in order, through the forms of law, to rob it of its just rights and at the same time accomplish his own avaricious purposes. The next friend is deemed an officer of the Court, and the minor a ward of the Court. If two suits are brought by different persons, acting as next friends, the Court will allow that one of them to be proceeded in which, on inquiry, appears most to the ward's benefit, and will stay proceedings in the other.

\* \* \* \* \* \*

"Sec. 112. Next Friends of Minors and Lunatics.— Although the practice of allowing infants and persons of unsound mind to sue by their guardian, describing him as such, prevails in this State, still he is in all respects a next friend; and is charged with all the duties and liabilities, is subject to the same restraints, and bears the same relation to the infant, or non compos, and to the suit, as though he had been described as his next friend. The distinction, however, is more formal than material: if it be to the interest of the ward to have the guardian considered as a next friend, he will be so deemed. The Chancery Court of this State has full and original jurisdiction of the persons and estates of minors and persons of unsound mind, and may appoint, or remove, guardians whenever the interests of the minor, or non compos, require such action. \* \* \*''

In Williams v. Gaither, 1918, 139 Tenn. 587, 202 S.W. 917, suit for personal injuries was brought by next friend in behalf of the plaintiff who had become a non compos and for whom no regular guardian had been appointed. Later a guardian was appointed and the guardian filed an additional suit for damages arising out of the same automobile collision. The guardian then filed a petition in

the original suit brought by next friend seeking a dismissal which was granted by the Trial Court and affirmed by the Court of Civil Appeals. Our Tennessee Supreme Court granted certiorari and reversed the action of the two lower courts. The Supreme Court held that the guardian had no right to dismiss the suit which was brought by the next friend.

However, the court did state that upon appointment of a regular guardian, such guardian became the successor of the next friend in respect of the right to control the suit because he had power to control the non compos and all of his personal affairs. However, the court said that the guardian should have asked the lower court to be substituted in the place of the next friend in the original suit for damages brought on behalf of the non compos. Upon the granting of this motion the guardian would have then had the right to have dismissed the suit and brought another suit or assumed continued control of the original action.

Now in the case at bar a regular guardian of the non compos already had been appointed and qualified when the suit was brought by Mrs. Dorothy Ann Hunt Phillips as next friend of Charles Emerson Hunt making the wife, Marie Sommers Hunt, and also the guardian, A. V. McDowell, parties defendant. The defendant, A. V. McDowell, was put to an election.

██ If he was of opinion that the original suit brought by Mrs. Phillips as next friend had merit and was to the best interest of his ward the non compos then he could have followed the procedure suggested in Williams v. Gaither, supra, and asked the court to substitute him as party complainant as guardian of Charles Emerson Hunt in place of Mrs. Phillips. On the other hand if he were

of the opinion that there was no merit in the bill for annulment brought by Mrs. Phillips on behalf of the non compos then he should have so stated in his answer and asked that the original bill be dismissed. He did neither.

■ Instead he filed a formal answer admitting the physical and mental disabilities of his ward and admitting that a justiciable controversy was presented which should be decided by the court; namely, the question of whether or not the non compos, Charles Emerson Hunt, had sufficient mental capacity to enter into a valid marriage with the defendant, Marie Sommers Hunt. Since the regular guardian refused to take a stand either for or against the suit, we think complainant was entitled to proceed as next friend of Charles Emerson Hunt, Jr. We hold that His Honor the Trial Judge was erroneous in his ruling that the original bill was not properly filed by Mrs. Phillips as next friend of Charles Emerson Hunt. Assignment of error No. VI is therefore sustained. However, it appears that His Honor also heard the case upon its merits and considered all the evidence introduced in the cause and therefore his error is not reversible. T.C.A. Section 27-117.

In Bryant v. Townsend, 1949, 188 Tenn. 630, 221 S.W.2d 949, our Tennessee Supreme Court, through Justice Gailor, held that a marriage entered into by an insane person who had not been legally declared insane was not void ab initio but was only voidable because Tennessee had no statute that prohibited or annuled the marriage of an insane person; T. C. A. Section 36-411 forbids the clerk to issue a license when one of the parties is a known lunatic or imbecile but that disregard of this section does not render the marriage void but merely voidable citing

Keith v. Pack, 182 Tenn. 420, 423, 187 S.W.2d 618, 159 A.L.R. 101.

Complainant's first witness was Dr. James A. Taylor, Associate Professor, Department of Psychiatry, University of Tennessee College of Medicine, Memphis, and Clinical Director of Gailor Psychiatric Hospital of Memphis. Dr. Taylor had an excellent educational background and seemed eminently qualified in the field of psychiatry. He testified that he had first been acquainted with Mr. Hunt in 1953; that in March of 1954 he diagnosed him as suffering from a chronic brain syndrome due to birth injury and that in addition to this mental defect he was suffering from paranoia and delusions of persecution; and that he at that time recommended the appointment of a guardian for Mr. Hunt which advice was not followed. Dr. Taylor stated that he again examined Mr. Hunt in May, 1962, and found him still suffering from chronic brain syndrome associated with birth trauma and aggravated by paranoid tendencies; that his condition in 1962 was worse than he found him to be in 1954. He defined chronic brain syndrome as being a permanent irreversible mental disorder resulting from the fact that the brain does not rejuvenate itself and when once impaired it is impaired from that time on with no possibility of restoring or improving the mental condition. He gave as his professional opinion that Mr. Hunt was not competent to enter into a contract of marriage in 1958 and that he had not had sufficient lucid intervals since that time to ratify such a marriage.

Dr. Frank A. Latham, a practicing psychiatrist of Memphis, Tennessee, and a member of the staff of Baptist Memorial Hospital and Gartly-Ramsay Hospital, gave as his opinion based on a reading of the deposition of Dr.

Taylor and examination of records at the Tennessee Psychiatric Hospital in Memphis and other medical records of Mr. Hunt that Mr. Hunt would not have been capable of making his own decisions.

Mr. Pulliam, a neighbor of Mr. Hunt for 10 years on Summer Avenue, testified that the defendant, Marie Sommers, and her first husband and two children all moved out into the home of Mr. Hunt on Summer Avenue before Mr. Hunt and Mrs. Sommers were married; that after their marriage the first husband continued to live in the home with the parties with the permission and at the request of the non compos, Mr. Hunt; that the first husband acted as a sort of "bodyguard" for Mr. Hunt. Mr. Pulliam testified that Mr. Hunt's mental condition got no better nor worse during the years.

Mr. Turner B. Wilson, an employee of Matthews Market on Summer Avenue for the past ten years, had known Mr. Hunt for several years. He testified that Mr. Hunt was in and out of his store six and eight times a day and that he oftentimes told him about writing the President of the United States letters; he saw in Mr. Hunt's hand large envelopes with large writing on the outside requiring many stamps; that Mr. Hunt often cashed checks at his store; that he oftentimes bought fifteen to twenty dollars worth of books at a time; sometimes he would take the books without paying for them and they would have to go to his home and get the books or have the police go and get the books back; that Mr. Hunt seldom wore shoes and wore a very old pair of pants.

Mrs. Phillips testified that after her father died, her brother, Charles Hunt, loafed at the father's furniture store and pretended to be active in the business; that he

would try to sell furniture; if he couldn't sell it at cost he would sell it for less than cost; that he had had a driver's license which was taken away by the authorities before their mother died in 1951 and that for the past fifteen years his mental condition had been about the same as it was at the time of the trial; and that her brother was often arrested before and after his marriage to the defendant, Marie Sommers, and that he had been mentally incompetent for the last fifteen years or more. Mrs. Phillips testified that shortly after Mr. Hunt and the defendant, Mrs. Marie Sommers Hunt, were married Mr. Hunt told Mrs. Phillips in the presence of his wife that his wife was trying to get him to sign over everything he owned to her and that the defendant wife did not deny it.

Mrs. Mae Slocum, a cousin of Mrs. Hunt, Sr., testified that after Mrs. Hunt, Sr., died in 1951, Mr. Hunt, Jr., seemed to look to her to take his mother's place; that oftentimes when he would run afoul of the law or otherwise get in trouble he would call upon Mrs. Slocum for help; that she had visited him since he had been to Bolivar; that he had been mentally incompetent for more than fifteen years and that his condition fifteen years ago was the same as it is now except as aggravated by the taking of certain pills.

Mr. John C. Hunt, aged 79, of San Antonio, Texas, an uncle of Charles E. Hunt, Jr., testified that over the past forty years he has visited Memphis, Tennessee, once or twice each year and that he always visited his nephew, Charles E. Hunt, Jr.; that when he visited Charles Hunt, Jr., at his home on Summer Avenue before his marriage the defendant, Marie Sommers, and her first husband were living there and that after his marriage the first husband continued to live there. Further, he testified that

his nephew had written him from time to time over the years in large envelopes with big writing containing much obscene material and that Charles' mental condition was just as bad fifteen years ago as it is at the present time except that about the time he married Mrs. Sommers he began taking certain pills or tranquilizers which aggravated his already deficient mental condition.

The records of the Tennessee Psychiatric Hospital and Institute of Memphis relating to the history of Charles E. Hunt, Jr., were shown by the Medical Records Librarian. Mr. Hunt was admitted on May 28, 1962. The Librarian, Mrs. Springfield, testified that the records showed that Mr. Hunt was admitted on a civil commitment because he had been writing pornographic letters to the President of the United States; that he was hostile, aggressive and paranoid; that he had been taking amphetamine medication for the past three years in large doses with resultant abnormal behavior; that Mr. Hunt had congenital defects of hands and feet; that he dressed with carelessness and his clothing was often covered with particles of undigested food and spilled drink; that his speech was explosive in nature; that his voice was loud and he walked in a rather crablike fashion due to his abnormal feet; that he had rather spastic-athetoid movements of the upper extremites with only fair motor coordination; that he felt he had been put in a hospital for political reasons and in order that his wife might get all his money; that he accused his wife of being a lesbian and accused her former husband of being a homosexual; that he stated that his mother was a prostitute and had amassed a fortune from such practices and that he, Charles Hunt, Jr., had $84,000 in government bonds and some $700,000 hidden away somewhere; that Mr. Hunt,

Jr., was known sometime to take as many as thirty to forty amphetamine tablets at one time; that he seemed to be obsessed with a persecution complex and was of opinion that both his wife and his lawyer had stolen property from him; that the staff members at the hospital had diagnosed Mr. Hunt's condition as (1) chronic brain syndrome due to birth injury, (2) chronic brain syndrome due to misuse of amphetamines, (3) cerebral spastic infantile paralysis with aphonia and athetosis and that the unanimous opinion of the staff was that he should be institutionalized at Western State Hospital in Bolivar, Tennessee; that he was discharged from the Tennessee Psychiatric Hospital on August 10, 1962, and committed immediately to Western State Hospital at Bolivar.

The Medical Records Librarian of Gartly-Ramsay Hospital in Memphis testified that the records showed that Mr. Hunt was admitted to that institution on June 14, 1961, on orders of Dr. D. C. McCool; that he had a chronic brain syndrome aggravated by paranoia and that Mr. Hunt was under investigation by the F.B.I. for mailing lewd and obscene material to a number of persons including the President of the United States; that Mr. Hunt was incoherent and insisted that he did not know why he was in the hospital.

The Medical Records Librarian at John Gaston Hospital in Memphis, Tennessee, also testified that the records of that institution showed that he was admitted upon a lunacy warrant filed by his wife because of abnormal behavior over an undetermined length of time; that the admissions record showed that Mr. Hunt stated that if the doctors had let him be born naturally instead of having cut into his mother's stomach that he would not be in the condition he was in; that Mr. Hunt expressed delu-

sions of grandeur; and also he expressed feelings of persecutions by both doctors and lawyers.

The defendant, Mrs. Marie Sommers Hunt, remained in the courtroom during the entire trial but did not take the stand at the conclusion of the complainant's proof. Her first witness was the Rev. J. Ralph McIntyre, Pastor of Brainerd Baptist Church in Chattanooga, Tennessee, who was Assistant Pastor of Bellevue Baptist Church in Memphis, Tennessee, from August 1, 1956, through April, 1959. Mr. McIntyre was the minister who officiated at the marriage ceremony between Charles E. Hunt, Jr., and Mrs. Marie Sommers Hunt. Mr. McIntyre remembered the marriage ceremony and that Mr. Hunt had a marked physical disability, namely that he was spastic, and that his wife spoke with a heavy accent; that he had never seen either of the parties before or after the ceremony and that he could not give any opinion as to the mental competency of appellant and appellee except that he observed nothing on the occasion of the ceremony to indicate that either of the parties was incompetent to enter into the marriage and that had he had any doubts about the mental competency he would not have performed the marriage ceremony though he did not counsel with them before this marriage ceremony as he usually did because it was an unusual marriage.

Mr. Perry, an employee of the Probate Court Clerk of Shelby County, produced in court the record of the estate of Charles E. Hunt, Sr., and his wife, Mrs. Daphne N. Hunt. Under the will of Charles E. Hunt, Sr., his son and daughter received $10,000 each and the remainder of his property went to his widow, Mrs. Daphne Hunt.

Mr. Robert H. Jones, Jr., an accountant associated with the firm of Homer K. Jones & Company, testified that he

had known Charles E. Hunt, Jr., for approximately 14 years; that he had prepared the inheritance tax return for the estate of Mrs. Hunt, Sr., showing a gross estate of $87,500 and a net taxable estate of $24,700; that gift tax returns filed by Charles E. Hunt, Sr., showed a gift of $13,750 to Charles E. Hunt, Jr., in 1948 and $19,756 to Mrs. Dorothy Ann Hunt Phillips. Charles E. Hunt, Jr., and Mrs. Dorothy Hunt Phillips were named administrators C.T.A. of the estate of Mrs. Daphne N. Hunt but apparently Charles E. Hunt, Jr., did not testify at the probate of the holographic will of his mother Mrs. Hunt. Mr. Jones testified that each year Charles E. Hunt, Jr., would come by his office in February or March and submit certain figures from which Mr. Jones prepared Charles E. Hunt, Jr's income tax returns; that within a few days Charles E. Hunt, Jr., would return to the office, sign the tax return and deliver a check for the tax which Mr. Jones would mail.

Mr. McDowell, the guardian, testified that he refused to file the suit to annul because he was not certain whether Mr. Hunt, Jr., was of sufficiently sound mind to enter into a legal marriage or not; that after he qualified as guardian he talked with Mr. Hunt on the telephone and on two occasions Mr. Hunt and his wife came by his office; that in going over Mr Hunt's business affairs he found some business deals which appeared rational and others which appeared irrational; that on the day of the trial he had talked with Mr. Hunt by telephone at Bolivar through Dr. Levy and Dr. McAlister relative to his attitude on the annulment action; that Charles Hunt, Jr., stated in substance that if he could get out of the hospital and come home he wanted to stay married but that if he was not able to get out of the hospital and was going to

have to stay at Bolivar then he didn't want to stay married. Further, Mr. McDowell testified that Charles Hunt, Jr., had talked with him about producing a movie saying that he was a friend of Walter Wanger, a movie producer in Hollywood. Mr. McDowell estimated the present value of Charles E. Hunt's estate to be $122,000 of which $44,000 is secured by first mortgages or deeds of trusts on real estate.

Mr. Homer Armstrong, an attorney of Memphis, Tennessee, testified that he had represented Mr. Hunt over a period of many years in various business and legal transactions; that during the year 1958 when he was married that he saw Mr. Hunt an average of once a week; that it was his opinion that Mr. Hunt at this time was of sound mind but under severe physical disability. Mr. Armstrong refused to discuss the specific business transactions which he had with Mr. Hunt on the grounds of private communication between attorney and client. His position was sustained by the Trial Judge.

Miss Ann Neely, also a licensed practicing attorney of Memphis, Shelby County, Tennessee, testified that she had lived in Memphis since 1944 and had formerly lived in the home of Mrs. Daphne Hunt, mother of Charles E. Hunt; that in 1949 and 1950 Mr. Hunt also lived in the home with his mother; that while his dress was always sloppy and he was eccentric with many physical defects she was of opinion that he was of sound mind back in 1949, 1950, and 1951 when she saw him often and that shortly after his marriage to Mrs. Marie Sommers Hunt he brought his wife and a stepdaughter to her office for a visit with her; that in her opinion he was mentally competent though physically disabled.

Dr. McAlister of Western State Hospital and Dr. DeLange of Tennessee Psychiatric Hospital testified as to the present mental condition of Charles E. Hunt; that he was of dull normal intelligence and at present mentally incompetent to enter into contracts.

After several witnesses had been presented by the defense, the matter of the defendant Mrs. Marie Sommers Hunt taking the stand was mentioned by the court. Solicitor for complainant indicated that he would object to her testifying because she had been present while the other witnesses for defendant had been testifying in violation of the rule which had been called for. Mrs. Hunt was never offered as a witness by the defense.

One of the earliest cases decided by our Tennessee Supreme Court relating to the validity of marriages entered into by persons of unsound mind is the case of Cole v. Cole, 1857, 37 Tenn. 57. In that case the Supreme Court held the marriage valid even though it was proven that from time to time the wife was deranged mentally. From that opinion we quote at length as follows:

"Marriage, by our law, is a civil contract, and may be avoided, like any other contract, for want of sufficient mental capacity in the parties. If the mind is unsound at the time, it is incapable of consent, and that is an essential element in all contracts.

In the dark ages, when there was thought to be something sacred and mysterious in the matrimonial relation, and its civil was almost obliterated by its spiritual character, the marriage of persons of unsound mind was held valid. Blackstone, in 2d volume of his Commentaries, 438, 439, says this was 'a strange determination, since consent is absolutely requisite to matri-

mony, and neither idiots nor lunatics are capable of consenting to anything.' The test question in all such cases is whether the party is capable of making any binding contract. The identity of the doctrine that unsoundness of mind vitiates this as well as all other contracts is well established. But every consideration of policy and humanity admonishes us that a contract so essentially connected with the peace and happiness of individuals and families, and the well-being of society, should not be annulled on this or any other ground, not clearly made out. The consequences, in many cases, would be most deplorable. The rights of property would be unsettled, and the peace of families destroyed, to say nothing about the effects upon the innocent offspring. The annulment of other contracts would only affect property; but this would do that, and more—it would tell upon the happiness, character, and peace of the parties. The appalling character of these consequences is well calculated to impress the courts with the solemn duty of requiring a clear case for the application of the general principle to this delicate and important contract. It is, however, only a civil contract, and must stand or fall by the usual tests applicable to contracts.

It is not every unsoundness that will avoid a contract. The degree necessary to produce this effect is fixed by the law, and must be made out by proof. All persons of lawful age are presumed to be capable of contracting, until the contrary is made to appear. So, sanity is presumed, and if the contrary is alleged, it must be proved by the party imputing it. If a state of permanent insanity is once shown, the burden of proof shifts, and a lucid interval must be proved by the other side.

But the rule is different in a case of temporary insanity, depending on some exciting cause not in perpetual action.

"The general rule is, 'that those who have not the regular use of their understanding, sufficient to deal with discretion in the common affairs of life, or the weakness being so considerable as to amount to derangement, are incapable of contracting a valid marriage, or making any other binding contract.' Bishop on Mar. & Div., sec. 177.

Sir John Nicholl, in Browning v. Reane, 2 Phillim. 69 (1 Eng.Ecc. 190, as cited by Bishop, sec. 178), says: 'If the incapacity be such that the party is incapable of understanding the nature of the contract itself, and incapable, from mental imbecility, to take care of his or her own person and property, such an individual cannot dispose of his or her person and property by the matrimonial contract, any more than by any other contract.'

It is difficult to describe any exact, palpable line between legal capacity and incapacity Perhaps this is impracticable, as an abstract thing, in reference to the ability to make a valid contract, as insanity subsists in various degrees, and the line of separation between it and mere imbecility is often faint and imperceptible. The general test is the fitness of the person to be trusted with the management of himself and his own concerns. Such a person has a disposing, contracting mind, although it may be in a degree impaired."

■■ Since the case was tried below before the court without a jury it comes to this court on appeal for trial de novo accompanied by a presumption of correctness of

the court below. T.C.A. Section 27-303. We find the evidence does not preponderate against the judgment of the court below but in favor of it. Even though the complainant below, Charles E. Hunt, Jr. was handicapped both physically and mentally, we are convinced that he did understand the nature of the marital contract, the benefits, obligations and responsibilities ensuing therefrom; that he entered into the contract knowingly and willingly. If it be conceded that Mr. Hunt might have been mentally incompetent from use of drugs or overpersuasion at the time of the saying of the ceremony unquestionably he had many, many lucid moments between July 18, 1958, and August 10, 1962, in which he ratified and confirmed the marriage ceremony. Assignments of error I, II, III, IV, V, X, XVII, XVIII and XIX are overruled.

Assignments of error VIII and IX assail the action of the Trial Judge in holding that the next friend, Mrs. Dorothy Ann Phillips, was guilty of laches and also estopped to question the validity of Charles E. Hunt's marriage. In June, 1961, Mrs. Phillips accepted a deed from Mr. Hunt to an undivided one-half interest in a parcel of real estate located in Memphis, Tennessee, which Mrs. Daphne Hunt intended to devise to Mrs. Phillips but neglected to do so. The deed was given by Charles E. Hunt to Mrs. Phillips in recognition of her moral and equitable title to this property. We must remember that the present suit was brought by Mrs. Phillips only as next friend and not in her individual capacity though as a practical matter she stood to gain financially if the suit was successful because she in all probability would be the sole heir of Mr. Hunt. The fact that she accepted a deed from Mr. Hunt and also failed to bring suit to invalidate the marriage until after the expiration

of several years do not serve to estop her from bringing suit as next friend nor to establish her guilty of laches. Such facts serve only to negate her testimony and insistence that Mr. Charles E. Hunt, Jr. was mentally incompetent to enter into a marriage in 1958.

In Bryant et al. v. Townsend, 1949, 188 Tenn. 630, the alleged non compos had died when suit was brought by his brothers and sisters seeking to avoid the marriage. Our Tennessee Supreme Court held that a delay by the brothers and sisters to bring the suit within the six week period between the marriage of the alleged non compos and his death constituted such laches as to require their bill to be dismissed. However, they were bringing suit in their own right and not as next friend of the alleged non compos. In the present case if Mrs. Phillips had proof sufficiently cogent to prove by a preponderance of the evidence the mental capacity of her brother to enter into a valid marriage then it would be inequitable to penalize him because she had accepted a deed from him or had failed to bring suit promptly after his allegedly void marriage ceremony. Assignments of error VIII and IX are sustained.

■ Assignments of error XI and XII relating to the exclusion by the Trial Judge of certain opinion testimony concerning the mental competency of Charles E. Hunt are pretermitted because such evidence even if held competent and admitted would not be sufficient in the opinion of this court to overturn the uncontradicted evidence upon which we find Charles E. Hunt to have been mentally competent.

■ We find no merit in assignment of error No. XIII insisting that the failure of Mrs. Hunt to take the stand gave rise to a presumption that her evidence would be

adverse to her theory of the case. The record does not affirmatively show that Mrs. Hunt deliberately refused to take the stand but only that she failed to take the stand as the first witness in her behalf. After attorney for complainant voiced an objection to her becoming a witness because she did not testify first nor observe the rule she was never offered as a witness. For this reason we do not think the presumption mentioned ever came into being.

## ALLOWANCE OF ATTORNEYS' FEES AND EXPENSES

Prior to the date of the trial in the court below the defendant, Mrs. Marie Sommers Hunt, was awarded $500.00 as attorneys' fees pendente lite which was paid by the guardian. After the trial and judgment in favor of the validity of the marriage, His Honor the Trial Judge awarded the attorneys for Mrs. Hunt $2,500 in fees and $519.95 in expenses. He ordered the guardian to pay these sums. The guardian refused to pay without permission of the Probate Court before whom the guardianship was pending. The Probate Court refused to authorize payment of the attorneys' fees and expenses but the record before this court does not show the judgment of the Probate Court nor the reason for refusal of payment.

Mrs. Marie Sommers Hunt, through her attorneys, has filed a petition in this court stating under oath that she had no funds with which to pay her attorneys and asking this court to allow attorneys' fees and expenses. We do not notice any response in the record from the guardian to this petition. Attorney for the next friend, Mrs. Dorothy Ann Phillips, by assignments of error XV and XVI insists that the Trial Judge was in error in di-

recting the guardian to pay the $2,500 attorneys' fees and $519.95 expenses. Since we have held that the marriage is valid and since the regular guardian of Charles Hunt, Jr., Mr. McDowell, is before the court as a party defendant, we hold that Mrs. Phillips as next friend is not now in position to question the awarding nor the amount of such attorneys' fees and expenses. Therefore, assignments of error XV and XVI are overruled.

We are cited to no authority in Tennessee which expressly holds that the wife in an annulment suit is entitled to an award for attorneys' fees and expenses where she is not financially able to pay for the same. By analogy it would seem that she would be entitled to attorneys' fees and expenses just as in cases involving divorce and separate maintenance. Winslow v. Winslow, 133 Tenn. 663, 182 S.W. 241; Gibson's Suits in Chancery, Vol. 2, Section 1144.

"Although a few courts take the position that in the absence of statutory authority to require payment of temporary alimony, attorneys' fees, or suit money in annulment actions, the court has no authority to order such payments, the general rule is that where action is instituted by the husband against the wife for the annulment of their marriage, and the validity of the marriage relation is in actual dispute or is in good faith disputed by the wife, she may, in the discretion of the court, be allowed alimony pendente lite, counsel fees, and suit money in reasonable amounts. * * *" 4 Am.Jur.2d, Annulment of Marriage, Section 97 entitled "Allowance of counsel fees, suit costs, and alimony pendente lite", page 509.

We hold that where the suit for annulment fails, as in the present case, and the wife is unable to pay rea-

sonable attorneys' fees and costs, as in this case, her attorneys are entitled to an award out of the funds of the non compos complainant husband. Therefore, we affirm the judgment of the lower court in awarding attorneys' fees and expenses to the attorneys for defendant wife, Mrs. Marie Sommers Hunt. Her attorneys are entitled to some additional compensation for the successful defense of the case in this court. However, the lower court as a trial court is in a much better position to take proof and make determination as to the proper fees and expenses to be allowed. We affirm the judgment of the lower court and remand the cause for the purpose of determining the full amount of fees and expenses to be awarded attorneys for defendant Mrs. Marie Sommers Hunt. The costs of the cause in the lower court will be taxed against the defendant guardian. The costs in the Court of Appeals will be taxed against the appellant, Mrs. Dorothy Ann Phillips, next friend. T.CA Section 20-1621

Avery, P. J. (W. S.), and Bejach, J., concur.

## ON PETITION TO REHEAR

Solicitor for appellant Dorothy Ann Hunt Phillips as next friend of Charles Emerson Hunt, Jr., has filed a petition to rehear. In ground one of the petition, solicitor for appellant takes this Court very much to task for having said in substance that we find Charles E. Hunt, Jr., to have been mentally competent to marry upon uncontradicted evidence. This statement was made by us in pretermitting assignments of error XI and XII relating to the exclusion by the Trial Judge of certain opinion testimony concerning the mental capacity of Charles E. Hunt. We did not mean that all of the evidence was uncontradicted.

Illustrative of the uncontradicted evidence referred to by us is the fact that the appellant, Mrs. Dorothy Ann Phillips, waited several years after her brother married the defendant before she protested the validity of the marriage. We also had in mind the uncontradicted testimony that Mr. Charles E. Hunt and his sister, the appellant, signed a joint petition to be named administrator C.T.A. of their mother's estate in the Probate Court of Shelby County in 1951; the petition was .granted; they qualified with corporate surety; in 1952 they made settlement with each other as the sole beneficiaries of the estate of their mother and filed a joint final settlement which was approved by the Court. At that time and subsequent thereto Mr. Charles E. Hunt had personal bank accounts in more than one bank in Memphis and managed his own financial affairs without any suggestion being made by Mrs. Phillips that he needed a guardian to attend to his affairs. Both his mother and father made gifts both inter vivos and testamentary to Charles E. Hunt directly without any mention of a guardianship for him.

We also had in mind the uncontradicted testimony of Miss Ann Neely, a licensed practicing attorney in Memphis, Tennessee, who knew Mr. Charles E. Hunt well and had lived in his mother's home. She testified that after Mr. Hunt's marriage to Mrs. Marie Sommers Hunt, he told her about his marriage on one occasion and later brought his wife and stepdaughter to her office for her to meet them. The testimony of Mr. Jones, the accountant, that he regularly made Mr. Hunt's annual income tax return from figures furnished him by Mr. Hunt himself was also uncontradicted. This ground of the petition to rehear is therefore respectfully overruled.

The second ground of the petition to rehear is that this Court erroneously overruled assignment of error XIII relating to the failure of Mrs. Marie Sommers Hunt to take the stand. Solicitor for petitioner insists that this Court "proceeded to heap the blame upon attorney for appellant for appellee's failure to testify." We certainly did not intend to heap any blame upon solicitor for appellant. The following is the colloquy which transpired relating to the failure of Mrs. Hunt to take the stand:

"THE COURT: Mr. Batchelor, do you intend to put the defendant, Mrs. Marie Sommers Hunt on the stand in this case?

MR. BATCHELOR: We can't do that now. She can't take the stand. She is precluded.

THE COURT: You don't intend to put her on?

MR. BATCHELOR: If Mr. Taylor objects, I don't know that I can.

MR. TAYLOR: It is not a question of objecting. It is a rule of law.

THE COURT: If you wanted to put her on, you should have put her on first. Let's see what happens. I am afraid I'm going to have—

MR. TAYLOR: (Interposing) there is not any question in my mind because I have had it come up before. That is the reason I had Mrs. Phillips go out, even though she is a party.

THE COURT: There was in Section 8 a charge of fraud and conspiracy. Is there any proof on that?

MR. TAYLOR: I can't prove it without her.

THE COURT: You have the burden, Mr. Taylor.

MR. TAYLOR: The burden is on me, yes, sir, but there are some things you can't prove by your own witnesses. If she doesn't take the stand, I have no way of proving it.

THE COURT, All right."

■ This member of the Court knows of no rule of law that in a civil case the defendant must testify, if at all, before his other evidence is presented. In criminal cases if the defendant testifies in his own behalf, he must do so before any other testimony is heard for the defense. T.C.A. Section 40-2403. This statute does not apply to defendants in civil cases. Gilreath, Aderholt, Caruthers History of a Lawsuit, 8th Edition, Section 330, page 379.

■ Apparently His Honor the Trial Judge, the solicitor for the complainant and the solicitor for defendant, all thought that the defendant, Mrs. Hunt, was precluded from testifying because she was not put on as the first witness for the defense. However, if the solicitor for complainant felt that he needed the testimony of Mrs. Marie Sommers Hunt so badly he had two courses to follow: (1) He could have announced a waiver of any objection to Mrs. Marie Sommers Hunt being offered as a witness on her own behalf. (2) He could have called Mrs. Marie Sommers Hunt as a witness for the complainant and cross-examined her as a hostile witness.

It may well be that Mrs. Marie Sommers Hunt was not offered as a witness in her own behalf because of the probable embarrassment from the cross-examination by Mr. Taylor. Solicitor for complainant had already proven that her first husband continued to live in the home after her divorce from him and second marriage to Mr. Hunt. Solicitor for appellee has, in his reply to the petition to

rehear, cited to this Court for the first time T.C.A. Section 24-104 which is as follows:

"Transactions with mentally incompetent party. It shall not be lawful for any party to any action, suit or proceeding to testify as to any transaction or conversation with, or statement by, any opposite party in interest, if such opposite party is incapacitated or disqualified to testify thereto, by reason of idiocy, lunacy, or insanity, unless called by the opposite side, and then only in the discretion of the Court. Provided, if a corporation be a party, this disqualification shall extend to its officers of every grade and its directors. Provided, further, that in actions for divorce either party shall be at liberty, as a matter of right, to testify to all transactions between them, including such as may occur by virtue of the marital relation."

We find it unnecessary to construe this statute and determine judicially whether or not Mrs. Hunt could have legally testified as a witness in her own behalf over the objection of solicitor for complainant. Such an opinion would be dicta. We adhere to our former holding that the presumption of adverse testimony on the part of Mrs. Hunt never came into being.

If we assume that Mrs. Hunt was not formally offered as a witness in her behalf because of her fear of rigid cross-examination from solicitor for complainant and because she would give evidence of her husband's mental capacity which would be adverse to her case we still are of opinion that such presumption of adverse testimony would not be sufficient to overcome the finding of fact of the Trial Court and of this Court from uncontradicted testimony that Mr. Hunt's marriage in 1958 was valid. If we further assume that he was incapable of

marriage at the time of the ceremony, by drugs or otherwise, we still find that on many occasions thereafter he had periods of lucidity and fully understood the nature of the marital contract and in all things ratified and approved the marriage ceremony.

We have reread our former opinion in this cause, we feel that we have reached the correct result. The petition to rehear is respectfully denied.

Avery, P. J., (W. S.), and Bejach, J., concur.