Matter of Verrastro (2025 NY Slip Op 51721(U))

[*1]

Matter of Verrastro

2025 NY Slip Op 51721(U)

Decided on October 28, 2025

Surrogate's Court, Erie County

Mosey, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 28, 2025
Surrogate's Court, Erie County

In the Matter of James P. Verrastro, Deceased.

File No. 2025-507/G

PFALZGRAF BEINHAUER GREAR HARRIS SCHULLER LLP
LINDA STRAVALACI GREAR, ESQ.,
Appearing for Petitioner Anthony J. Baynes, Executor
REBECCA VAN OWEN, Pro Se
Not Appearing

Acea M. Mosey, S.

MEMORANDUM, ORDER and DECREE
James P. Verrastro [hereafter, decedent] died testate on January 18, 2025. He was survived by two children, James Adam Verrastro [hereafter, Adam] and Alexandra Verrastro, and by an alleged spouse, Rebecca Van Owen [hereafter, Rebecca]. Anthony J. Baynes [hereafter, Anthony], decedent's cousin and the executor nominated under decedent's December 19, 2024 Last Will and Testament [hereafter, the Will], received Preliminary Letters Testamentary on March 4, 2025. The Will was admitted to probate, and full letters were issued to Anthony on April 9, 2025 on consent of all interested parties.[FN1]
The Will makes provision for decedent's children, grandchildren, brother, and step-daughters, but not for Rebecca (in any capacity).
On April 2, 2025, Anthony filed a petition for advice and direction, seeking to determine the status of Rebecca, decedent's alleged spouse. He also sought discovery pursuant to SCPA 2103. Anthony alleged that Rebecca's status as decedent's surviving spouse was uncertain because no Marriage Certificate had been provided, only a Marriage License. Anthony contends that a License is insufficient under Tennessee law to establish the validity of a claimed marriage. He urges that the alleged marriage is not recognized by the State of Tennessee until the Shelby County Clerk's Office receives both the Tennessee Department of Health - Certificate of Marriage form and the bottom tear-off portion of the Marriage License - Rites of Matrimony. Because neither of these forms have been provided, Anthony contends that Rebecca's claim of marriage to decedent is unsupported and is not recognized under Tennessee law.
Several petitions and other papers have been filed by Rebecca, including, but not limited [*2]to, Rebecca's pro se motion for advance payment to her pursuant to SCPA 2102(5), a request for advice and direction, and a notice of election, as amended. All of these assert that Rebecca is decedent's surviving spouse, and her applications hinge on that status. If Rebecca is not found to be decedent's spouse, dismissal of the applications would be required because she would have no standing to petition.
There being other proceedings pending before this Court with unresolved issues regarding Rebecca's status, whether she is in fact decedent's surviving spouse is a threshold issue. Accordingly, this Court set the status matter down for a hearing as to whether Rebecca was, or was not, decedent's surviving spouse.
An Order directing the evidentiary status hearing was issued by this Court on July 15, 2025. That Order was properly and timely served on Rebecca via overnight mail service with tracking, and also electronically via email and through the New York State Court's Electronic Filing system (on which Rebecca is enrolled and active).
The evidentiary hearing was held before me on August 12, 2025. And, despite being properly and timely served, and despite the obvious significance to the disposition of decedent's estate, Rebecca failed to appear.
Proof having been closed, I now find and decide as follows.
(I)
At the hearing, decedent's son, Adam, decedent's younger brother, Carmen Verrastro [hereafter, Carmen], and Anthony, all testified. Each gave credible, straightforward testimony, and I find all of their evidence highly persuasive.
All three witnesses testified to their closeness to decedent and their familiarity with decedent's personal relationships. Each witness testified that decedent had been married three times before his alleged marriage to Rebecca. Decedent's first marriage was to Judith Butler and it lasted approximately 11 years. That marriage produced two children: Adam and Alexandra Verrastro. Decedent next married Kathy Lenihan, and that marriage lasted approximately 30 years. Decedent then married Kathy L. Verrastro, with that marriage lasting approximately 10 years and ending in divorce in April of 2024.
Anthony, who knew decedent his entire life, testified to his "very close" relationship with decedent. He testified that he previously saw decedent "maybe once a month" and communicated with decedent frequently with "phone calls all the time." Anthony testified that decedent had told him about his intent to marry before each of his three marriages. Anthony knew of only three marriages of decedent's. As to an alleged fourth marriage—to Rebecca—Anthony heard about that only after decedent's death when Rebecca's former attorney contacted him and told him about it.
Anthony and Carmen testified that they were never told by decedent that he had married Rebeca, nor had either heard decedent refer to Rebecca as his wife.
At the hearing, decedent's son Adam testified that he was very close to his father and considered decedent to be his only true friend. Adam testified that he had briefly met Rebecca on approximately four occasions, but that his father never told him that he was married to Rebecca:
"Q: Okay. And did you ever see your dad and Rebecca Van Owen hold themselves out as a married couple at a social engagement?
A: No, I have not."
Adam testified that he learned that Rebecca claimed to be decedent's wife only after [*3]decedent's death:
"Q: And at some point you learned that she was claiming to be the spouse of your dad?
A: I heard that through—yeah, through Anthony and my Uncle Carm.
Q: So you didn't hear that from your father? Did you hear it from her? A: No."
Adam testified that he did not believe decedent was married at the time of his death:
"Q: Okay. Do you believe that your father was married to Rebecca Van Owen or any other person—
A: No, I don't.
Q: —the date of his passing?
A: I do not."
Decedent's brother Carmen also did not believe decedent was married at the time of his death:
"Q: Okay. Thank you. Do you believe that your brother James was legally married to anybody at the time of his passing?
A: No."
Anthony, as the executor, testified to his attorney's "numerous attempts" to obtain a marriage certificate, all of which have been unsuccessful.
At the hearing, the witnesses also testified to their inability to see or speak to decedent in the period close to his death. Anthony testified that, throughout his life, he spoke to decedent "all the time" on the phone, but that in the months and weeks leading up to decedent's passing, decedent did not answer his calls. Anthony only learned of decedent's death when he called Rebecca because decedent had not been answering his calls.
Carmen testified that he flew to Tennessee with his daughter to see decedent in the hospital, "to see my brother to say goodbye to him." Carmen testified that, when he got there, he was informed that Rebecca had taken decedent off of a ventilator and that decedent had already died.
A copy of a Marriage License from the State of Tennessee, County of Shelby, authorizing decedent and Rebecca to solemnize the rites of matrimony was admitted into evidence at the hearing. The Marriage License was allegedly signed by a clergyman on December 30, 2024. 
A copy of decedent's Last Will and Testament, dated December 19, 2024, was also admitted into evidence, along with a copy of correspondence from Anthony's attorney to Rebecca's former counsel and also to the Shelby County Clerk.
(II)
"The general rule is that the legality of a marriage 'is to be determined by the law of the place where it is celebrated'" (Matter of Farraj, 72 AD3d 1082, 1083 [2010], quoting Matter of May, 305 NY 486, 490 [1953]).
In Tennessee, marriage is governed by statute and not common law (Ochalek v Richmond, 2008 WL 2600692 [Tenn Ct App, June 30 2008, No. M2007—01628—COA—R3—CV], citing Coulter v Hendricks, 918 SW2d 424, 427 [Tenn Ct App 1995]).
Tennessee law requires that a couple wishing to be married must first obtain a marriage [*4]license from a county clerk directed to the officiant who is to solemnize the marriage (see Tenn Code Ann § 36-3-103 [a]). So long as the parties are of age, not of incestual relationship, not intoxicated or mentally ill, and not already married, the clerk must issue the marriage license (id., § 18-6-109, and §§ 36-3-101, -102, -103 [c][1], -105, and -109). The clerk does not examine the qualifications of the officiant to whom the license is directed (see Universal Life Church Monastery v Nabors, 35 F4th 1021 [6th Cir 2022], applying Tennessee statutory law, citing Tenn Op Atty Gen No 97-139, 1997 WL 654324 at *1-2 [Tenn AG Oct. 9, 1997]). The officiant performing the marriage ceremony signs and dates the license and returns it to the county clerk who issued it within three days of the ceremony (Tenn Code Ann §§ 36-3-303 [a], 36-3-303, 68-3-401 [c]). According to the County of Shelby, Tennessee, webpage, the county in which the Marriage License was issued:
"[a]fter the ceremony has been performed, both the Tennessee Department of Health - Certificate of Marriage form and the bottom tear-off portion of the Marriage License - Rites of Matrimony form must be completed and signed by the individual performing the ceremony and forwarded back to the County Clerk's Office to be recorded. The marriage is not recognized by the State of Tennessee until the Shelby County Clerk's Office receives both forms and they are entered into the state's system" (Shelby County Tennessee, Marriage Licenses, available at https://shelbycountytn.gov/574/Marriage-Licenses [last accessed Sept. 29, 2025]).
After the signed license has been returned to the clerk, the clerk forwards the marriage certificate to the Tennessee Office of Vital Records (Tenn Code Ann § 36-3-103 [c] [1]). At that point, the State Office of Vital Records registers the marriage certificate and records for purposes of State law that the individuals identified in the certificate are married (id., § 68-3-401). "If the State Registrar finds evidence that a certificate was registered through misrepresentation or fraud, he has the authority to withhold issuance of a certified copy of such certificate until a court determination of the facts has been made" (Tenn Op Atty Gen No 90-71, 1990 WL 513052 at *1-2 [Tenn AG July 16, 1990] [internal citations omitted]). "Thus, it is clear that the State Registrar is not required to register, preserve or issue certified copies of a certificate of marriage if the State Registrar finds that the marriage certificate contains improper data; was registered through misrepresentation or fraud; or that there has been a violation of the law so as to make the marriage void" (id.).
Neither a marriage certificate nor evidence that the Marriage License was filed with the State Registrar has been produced. At the hearing, Anthony testified that he and his attorneys made several attempts to obtain a copy of a marriage certificate from the State to no avail. The record before me fails to establish that there was a proper filing with the State; and, therefore, the provisions of Tennessee Code Annotated § 36-3-103 were not complied with.
"While a regularly solemnized marriage is presumed valid, that presumption is rebuttable upon presentation of 'cogent and convincing evidence' otherwise" (In re Estate of Smallman, 398 SW3d 134, 152 [Tenn 2013], quoting Guzman v Alvares, 205 SW3d 375, 380 [Tenn 2006]; see Aghili v Saadatnejadi, 958 SW2d 784, 789 [Tenn Ct App 1997]). Here, even if Rebecca's marriage to decedent were otherwise presumed valid, decedent's lack of capacity to enter into a marriage was raised at the hearing. "[M]arriage 'is a civil contract, and may be voided, like any other contract, for want of sufficient mental capacity of the parties. If the mind is unsound at the time, it is incapable of consent, and that is an essential element in all contracts'" (Brown v [*5]Watson, 2005 Tenn App LEXIS 387, 2005 WL 1566541 [Tenn Ct App, July 5 2005, No. E200-401229-COA-R3-CV] [citing Hunt v Hunt, 56 Tenn App 683, 412 SW2d 7 [Tenn Ct App 1965]).
Decedent's brother, cousin, and son all gave convincing testimony about decedent's deteriorating mental and physical condition shortly before decedent's alleged marriage to Rebecca on December 30, 2024. Decedent's death from pancreatic cancer 19-days later on January 18, 2025, and his being incommunicado with his close family members and friends throughout this period, colorably establish decedent's lack of capacity. Moreover, the issue of undue influence had been raised. In this regard, decedent's brother, cousin, and son testified to unsuccessful attempts by some of them to visit or to talk with decedent by telephone. All three testified convincingly that they were rarely able to speak to decedent leading up to his death. On the rare occurrence when decedent's son Adam was able to speak to decedent, he seemed to be on pain medications and/or other drugs and was in a great deal of pain. Carmen also testified that Rebecca had a very substantial degree of control over decedent while he was in the hospital, including having decedent taken off life support.
Finally, as noted, supra, Rebecca did not appear or testify or provide evidence at this hearing although she was timely served with an Order setting out the date of the hearing and its purpose. It could not have been more clear to Rebecca what the hearing issue was—namely, as set forth in the scheduling Order, "whether Van Owen is decedent's surviving spouse"—and the significance to her of the outcome of the hearing. And, yet, with all that was at stake for her, Rebecca knowingly failed to appear at the hearing.
In this posture of the record, I draw—as I am entitled to do—the strongest possible inferences against Rebecca's claim that she and decedent were lawfully married when decedent died and that decedent had the capacity to enter into a valid marriage at that time. See, e.g., Noce v. Kaufman, 2 NY2d 347, 353 [1957] and Matter of Comm of Social Services v. Phillip De G., 59 NY2d 137 [1983]; see also, Matter of Amonte M. [Mary M.], 112 AD3d 937 [2013].
I conclude that the alleged marriage between decedent and Rebecca was not valid and that decedent lacked the capacity to enter into a valid marriage on December 30, 2024. As such, Rebecca lacks standing to petition this Court for spousal right-of-election, or otherwise to inherit from decedent as his surviving spouse.
This decision shall constitute the Order and Decree of this Court, and no other or further order or decree shall be required.
DATED: October 28, 2025
BUFFALO, NEW YORK
HON. ACEA M. MOSEY
Surrogate Judge

Footnotes

Footnote 1:Rebecca signed a waiver and consent to probate notwithstanding that she was left nothing under the Will and was not mentioned in it in any way.