IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 15, 2011 Session

## IN RE:  ESTATE OF RAYMOND L. SMALLMAN, DECEASED, MARK SMALLMAN, ET AL., V. LINDA CARAWAY, ET AL.

**Appeal from the Chancery Court for Hamblen County**
**Nos. 2009P120 & 2009-440    Hon. Thomas R. Frierson, II., Chancellor**

---

**No. E2010-02344-COA-R3-CV-FILED-DECEMBER 12, 2011**

---

The two sons of decedent asked the Court to declare that their father died intestate and that his marriage to appellant a few days before he died was void because he was neither competent to make a will or enter into a marriage contract.  Upon trial, the jury determined that the deceased was not of sound mind when he executed a will, a copy of which was filed in evidence, and the will was obtained through undue influence of appellant.  The jury also found that the marriage between the decedent and appellant was invalid as well.  The Trial Judge approved the jury verdict and appellant has appealed.  We hold that material evidence supports the jury verdict as approved by the Trial Judge and remand.

**Tenn.  R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which  D. MICHAEL SWINEY, J., joined, and CHARLES D. SUSANO, JR., J., dissented and filed an opinion.

H. Scott Reams, Morristown,  Tennessee, for the appellant, Linda Caraway

Denise Terry Stapleton, Morristown, Tennessee, Douglas T. Jenkins, Rogersville, Tennessee, and W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the appellees, Mark Smallman and Jeffrey Smallman.

**OPINION**

This is an appeal from a jury verdict in a declaratory judgment proceeding involving

the estate of Raymond L. Smallman. The ultimate issues involved the establishment of a lost will and a challenge to the validity of the marriage between Raymond Smallman and defendant Linda Caraway. The action was brought by the two sons of Raymond Smallman, Mark Smallman and Jeffrey Smallman (the Smallman sons). The Smallman sons' Petition alleged they believed their father died without a will, but they anticipated that Linda Caraway would present the Court with a copy of the will for purposes of probate. The Petition also averred that Linda Caraway exercised undue influence over Raymond Smallman in order to obtain a marriage license, marry the decedent and obtain a signature on a will and take certain assets of the decedent.

Linda Caraway then filed a Petition alleging that she was Raymond Smallman's widow and was seeking appointment as the personal representative of the estate, and also an order admitting the copy of the Last Will and Testament of Raymond Smallman to probate.

On September 4, 2009, the Smallman sons filed a Complaint for Declaratory Judgment in the Chancery Court, seeking a declaration that the marriage between Raymond Smallman and Linda Caraway was "void and of no legal effect" and that Raymond Smallman died intestate. The Complaint averred that Mr. Smallman "lacked the legal ability to marry and therefore the claimed marriage to Linda Caraway shortly before the death of Mr. Smallman is utterly void and of no legal effect." They also alleged that the statutory requirements for a valid marriage were not followed, rendering the marriage void. The Complaint further alleged that the will executed by Mr. Smallman on April 16, 2009 cannot be found and there is a presumption that the will was revoked by Mr. Smallman before his death. The Smallman sons asked the Court to declare that their father died intestate, and demanded a jury trial.

The Court appointed Beth Boniface as the Administrator pendente lite of the deceased's estate and Letters of Administration were issued to Ms. Boniface.

Prior to trial, Linda Caraway filed a Motion in Limine and an Amended Motion in Limine seeking to prohibit the introduction of evidence of her real estate holdings and financial conditions and the Last Will and Testament of her mother, Rena Blair. These motions were denied.

A jury trial ensued, and the jury found that the marriage between Raymond Smallman and Linda Caraway was not valid and that the photocopy of the writing purported to be the Last Will and Testament of Raymond Smallman dated April 16, 2009 should not be established and admitted to probate. The jury also found that Raymond Smallman was not of sound mind when he executed the will of April 16, 2009 and that will was obtained through the undue influence of Linda Caraway. The Trial Court approved the jury verdict and

a Judgment was entered on June 30, 2010.

Defendant, Linda Caraway, filed a timely Notice of Appeal to this Court.

**Background**

Raymond Smallman was born November 13, 1937 and died July 7, 2009 at the age of 71. Smallman was rarely called by his first name and almost everyone who knew him called him "Bud" or "Sarge". Smallman had married Dot and they had two sons, Jeffrey and Mark. Dot died in 2004. Mr. Smallman served in the Army as a recruiter and he retired after serving 17 years. Upon retirement, he returned to his home town and opened a pawn shop called Sarge's Corner with his business partner Pete Balzano. Smallman was meticulous about recording all of his purchases, sales, loans, bills and other business of the shop in a ledger on a daily basis. The ledger was introduced into evidence and it showed that Mr. Smallman began writing in that particular ledger in 1991, although there were almost no entries in the ledger from the last months of his life.

Pete Balzano testified at trial, and said that Mr. Smallman was fond of Ms. Caraway and that he talked about getting married to her until he became ill with cancer in the Spring of 2008. Balzano said that he had heard Mr. Smallman say on more than one occasion that he was not interested in Ms. Caraway's money or possessions and she was not interested in anything of his and that his estate was for his family and her estate was for her family.

Ms. Caraway, who was 61 years old at the time of trial, stated that she was introduced to Mr. Smallman by a friend in 2006. After that introduction, he started stopping by her store to see her. He told her he had a list of qualifications he wanted in a lady and that he was lonely. According to Ms. Caraway, they started dating and seeing each other regularly. She related that they discussed marriage on their first date and that Mr. Smallman told her he was looking for a wife and she was the person he was looking for. She stated that she was not interested in marriage at the time but later she was agreeable to it and they discussed getting married in June 2007. She explained that she was taking care of her terminally ill mother during June 2007, so the wedding did not occur. She claimed that Smallman bought wedding rings in December 2007 and the plan was to get married in June 2008.[1] The plan was not carried out because in the Spring of 2008, Mr. Smallman was diagnosed with lung cancer and he underwent chemotherapy and radiation.

Ms. Caraway testified that Mr. Smallman's cancer reoccurred during the winter of 2009 and he underwent another round of chemotherapy at that time. She stated that he had

---

[1]Ms. Caraway's mother did not die until January 2009.

problems with lack of appetite and pain. Ms. Caraway started taking him to his pawn shop, to the grocery store and on other errands. In her opinion, his mind was fine and he was able to transact business. However, he stopped going to the pawn shop in mid-April and by June 2009, she recalled that his condition had deteriorated to the point that he was so fatigued he stayed in bed or on the couch much of the time. Ms. Caraway moved into Mr. Smallman's home in May 2009 and took charge of his care. She stated that she drove him wherever he needed to go, cooked his meals, washed his clothes, ran errands, took money back and forth to the pawn shop and did whatever else he needed. She remained in the residence with Smallman until his death on July 7, 2009.

Ms. Caraway testified that in April 2009 Smallman asked her to call attorney Clint Anderson and make an appointment with the attorney about making a will and other matters. She testified she took Smallman to Mr. Anderson's office for the scheduled appointment, and she claimed that she stayed in the waiting room of the attorney's office while Smallman met with Anderson. Anderson stated that he prepared the will on April 16, 2009 at Mr. Smallman's request. He stated that he discussed the terms of the will with Mr. Smallman and ascertained that he had the capacity to execute the will. He found Smallman able to answer his questions clearly and he was of the opinion that he knew what he wanted the will to say. Once the will was drafted, it was signed in the presence of Anderson and his secretary.

Following the execution of the will, Mr. Smallman was given the original will in an envelope that had "Last Will and Testament of Raymond Smallman" written on it.

Ms. Caraway testified that she was aware that the will was in a white envelope but did not know the provision of the will and she declined Mr. Smallman's invitation to read the will. The original will was never located after Smallman's death.

Mr. Smallman's partner in the pawn shop, Pete Balzano, contradicted Ms. Caraway's testimony that she did not know the terms of the will. Balzano testified that about a week or ten days before Smallman's death, he inquired of Ms. Caraway whether Mr. Smallman had a will and would he be taken care of under the terms of the will. Balzano claimed that in response to his question, Ms. Caraway told him that there was a will and that he was taken care of but if he needed to confirm this information he should talk to Mr. Anderson. She then telephoned Anderson and made an appointment for Balzano to see him, and according to Balzano, Ms. Caraway accompanied him to Mr. Anderson's office that same day and Mr. Anderson confirmed that there was a will and that he was taken care of in the will.[2]

---

[2] The copy of the will made certain provisions about the sale of Sarge's Corner that were favorable to Mr. Balzano.

Mark Smallman testified that neither he nor his brother Jeffrey were aware that his father had executed a will until after his death. Jeffrey stated that Ms. Caraway denied knowing that there was a will but she did tell him that she had taken Mr. Smallman to Mr. Anderson's office for the purpose of preparing a will. The brothers obtained a copy of the will from Anderson but they never found the original will in Smallman's house. Jeffrey related that after they got the copy of the will, he called Ms. Caraway and told her that his father had left everything to her. She responded that she had told Mr. Smallman that she did not want anything and that she would "deny the estate". At that point Jeffrey told her that if the original will was found, the brothers were going to "fight it."

On cross-examination, Ms. Caraway was asked about the circumstances that led up to her mother, Rena Blair, making a will in which she left Ms. Caraway her entire estate. Ms. Caraway explained that her mother had two daughters, herself and her sister Carolyn. Ms. Caraway agreed that after Carolyn died, her mother made a will that left her entire estate to Ms. Caraway and nothing to Carolyn's adopted daughter. The Blair will was admitted into evidence and showed that it was executed by Ms. Blair in October 2004, more than four years before Ms. Blair died. Ms. Caraway was also shown her answer to an interrogatory regarding the value of her real estate holdings, which she identified. The document, entered into evidence reflected that the value of her real estate holdings was approximately 2 million dollars.

There was substantial testimony presented by Ms. Caraway and the Smallman brothers that Mr. Smallman's physical condition continued to deteriorate during the spring of 2009 and that he stopped going to the pawn shop by mid-April and was confined to bed or the couch most of the time by May. Caraway maintained in her testimony that Mr. Smallman's mental condition remained good and that he was as sharp as he always had been. Mr. Smallman's long-time friend Jim Gose testified that Mr. Smallman was mentally competent just four to five days before his death. Mr. Smallman's cousin, Betty Collins also testified that he was mentally the same as he had been prior to his illness. She admitted that she and Ms. Caraway had become friends since the death of Mr. Smallman.

On the other hand, Kenneth Cole, the pastor of Mr. Smallman's church testified that he visited Mr. Smallman frequently during his illness and that he noted that he was in a weakened state during his last six months and that his condition worsened at the end so that he could barely converse. Smallman's friends Bobby and Teresa Darnell testified that they had stayed with Mr. Smallman on June 23rd, while Ms. Caraway went out. Both Mr. and Mrs. Darnell commented on Mr. Smallman's difficulty with communication that day, noting that they could not understand what he was saying. Roy Johnson who worked at Sarge's Corner since 2006 and knew Smallman well, testified that he noted a decline in both his physical and mental condition and that the last time he saw Smallman at the pawn shop he

was having problems walking and with comprehension. Mr. Johnson stated that toward the end of Smallman's life he had abandoned his well established habit of keeping his accounts in his leger.

Pete Balzano recalled the last time Smallman came to the pawn shop. He was accompanied by his son Jeff and he was very frail and had declined both physically and mentally. Balzano stated that by May and June Smallman could not deal with the business and Mr. Balzano had to deal with Ms. Caraway on all matters he normally would have discussed with Smallman. He recalled that when he saw Smallman on or about June 21st, he was struggling to communicate and was bedridden. He remarked that Mr. Smallman had meticulously kept his financial records in his ledge until he became ill. Smallman also neglected to renew the pawn shops Federal Firearms License during the Spring of 2009, even though this license was crucial to the operation of the pawn shop.

Mark Smallman's wife Susie saw her father-in-law every day or every other day during his illness. She testified that his decline during the last several weeks of life were marked and that he was bed-ridden and did not talk much. Susie and Mark Smallman both related how Mr. Smallman had not reacted to the visit of their son on June 29th as he usually would have. Their son was home on leave from the military and visited his grandfather in uniform. Mr. Smallman recognized his grandson but he did not interact with him at all. Mark Smallman recalled responding to a call from Ms. Caraway on June 25th. Ms. Caraway expressed concern about her ability to handle the care of Mr. Smallman on her own and they discussed the need to hire nurses. Mark testified that he stayed with his father all day and that his father was unable to talk in sentences. Mark also confirmed the testimony of Johnson and Balzano regarding his father's inability to look after his business and his abandonment of his ledger.

Jeffrey Smallman lives in Pennsylvania and visited his father for one week a year in the summer. Jeffrey visited his father in April 2009 and he was shocked at the changes in him since the previous summer. He noted, however, that in April, his father could still carry on a conversation. He returned to Tennessee in May to spend more time with his father, and found that he had further deteriorated. Jeffrey recounted that during the May visit he took his father to the pawn shop. During the stop at the shop, his father ended up collecting a fair amount of cash which he put in his pockets. When they returned home, his father found the money in his pockets but he had no understanding that the money was payments made to him by people who did business with the shop. Jeffrey related that he had called his father on June 21st to wish him a happy father's day but his father did not seem to understand his conversation and was incoherent.

Ms. Caraway testified that although Smallman's physical condition was deteriorating

during the Spring of 2009, he continued to ask her to marry him and that she kept saying no. At some point in June, however, she relented because she wanted to make him happy. They decided on a date for the wedding and Mr. Smallman asked Ms. Caraway to ask his cousin Betty Collins to be a witness to the ceremony. Ms. Caraway claimed she asked Mr. Smallman if he wanted her to call his pastor, Kenny Cole, and ask him to perform the ceremony. She stated that he told her not to ask Mr. Cole because his wife was sick. She said Mr. Smallman told her to ask Ross Carmack if he would preform the ceremony. Carmack is an investment advisor from whom Mr. Smallman had purchased annuities for his grandchildren and is also an ordained minister. According to Ms. Caraway, Mr. Smallman was too weak to go to the courthouse to apply for a marriage license, and she obtained the necessary form affidavit from the courthouse and filled it out for him. Ms. Caraway then asked attorney Bill Foutch to notarize the affidavit for the marriage license application. Foutch testified that he went to Mr. Smallman's home for that purpose on June 24, 2009. He related that Smallman was in bed when he arrived and that Ms. Caraway left him alone with Smallman. Foutch asked Smallman if he understood why he was there and Smallman responded "Yeah, to seal the deal." Mr. Foutch then asked him what he meant and he said something like "Being husband and wife." When asked if it was his opinion that Mr. Smallman knew what he was doing, Mr. Foutch responded: "I think so."

On the same day, June 24, 2009, Ross Carmack performed the wedding ceremony between Mr. Smallman and Ms. Caraway. Carmack stated that he was surprised when Ms. Caraway called him and asked him to perform the ceremony. He asked her why they wanted him to perform the ceremony and she replied that Mr. Smallman's minister was out of town and unable to perform it. Present at the ceremony, in addition to Ms. Caraway, Mr. Smallman and Mr. Carmack, were Betty Collins and Ms. Carmack. Notably absent were the Smallman brothers, their wives, their children and Ms. Caraway's daughters. Mr. Carmack testified that at the time of the ceremony Mr. Smallman was lying in the hospital bed and was physically unwell. However, he was of the opinion that he was mentally alert and understood what he was doing. Carmack appeared at the trial subject to a subpoena issued by Ms. Caraway and he was paid $1,600.00 to testify.

Mr. Smallman's cousin, Betty Collins, was also present at the June 24th wedding ceremony, and she stated at the trial that she was under subpoena and did not want to testify. Her testimony was that she witnessed the ceremony and that it was her belief that Mr. Smallman wanted the marriage. She was not sure that he actually said "I do" or if he just nodded his head affirmatively. Kenny Cole, the pastor of the church Mr. Smallman attended, testified that he was not asked to perform the marriage ceremony on June 24, 2009 but if he had been asked he would have been available to do so. He added that his wife's illness would not have kept him from going to Mr Smallman's home to perform ceremony as he visited there frequently during Mr. Smallman's last months.

Ms. Caraway was shown home health records that indicate that the home health workers were told not to attend to Mr. Smallman on June 24th by "the family". She stated that she did not recall making this request.

Smallman passed away thirteen days after the marriage ceremony, on July 7, 2009. Ms. Caraway did not inform the Smallman brothers, their families or any one else of the marriage during those thirteen days. She never told her daughters about the marriage and they only found out about it when counsel for the Smallman sons contacted them for an interview ten months after Smallman's death. In Pete Balzano's testimony, he said that he called Ms. Caraway on June 24th and asked if he could visit Mr. Smallman, and she told him not to come that day as they already had visitors from the church. She did not mention that they were getting married that day.

The day Mr. Smallman died Mark, testified that he was accompanied by Ms. Caraway, and they went to the funeral home to make arrangements. Mark gave the funeral home director the necessary vital statistics on his father in Ms. Caraway's presence. She did not say anything about the marriage in Mark's presence. The next day Mark returned to the funeral home to deliver his father's military uniform for the burial, and the funeral director told him to look at the death certificate when he got it. Ms. Caraway had waited until Mark was out of the room before telling the funeral director that she was the surviving spouse.

Mark stated that after this remark by the funeral director he started to feel uneasy, and related several events pertaining to Ms. Caraway after the death.

Jeffrey Smallman and his wife arrived in Tennessee on July 8th, the day after his father's death, and he testified that all of his father's important papers were missing from the house, including records of his bank accounts and tax returns. He looked in the filing cabinets in his father's office and found them empty. Ms. Caraway denied knowing what had happened to the documents and also denied any knowledge of a will. During their conversation, she told Jeff that she did not like keeping secrets and that she and his dad were married. She them proceeded to tell him that they were only "married on paper to save the pawn shop from the City of Morristown closing it. A surviving spouse can insist that the pawn shop stay open."

The issues on appeal are:

A.    Did the Trial Court err when it admitted evidence of the real estate holding of Linda Caraway and the last will and testament of Rena Blair?

B.      Is there any material evidence to support the jury's verdict invalidating the marriage of Linda Caraway and Raymond Smallman?

C.      Did the Trial Court err when it did not enter a directed verdict on the validity of the marriage of Linda Caraway and Raymond Smallman?

D.      Did the Trial Court err in not entering a judgment upholding the validity of the marriage notwithstanding the verdict of the jury?

The standard of review of a jury verdict is well settled under the Tennessee Rule of Appellate Procedure 13(d), which provides, "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." The Tennessee Supreme Court, in *Whaley v. Perkins,* 197 S.W.3d 665 (Tenn.2006) addressed the approach an appellate court should take when determining whether there is material evidence to support a jury verdict as follows:

[A]n appellate court shall : (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all countervailing evidence. Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies. If the record contains "any material evidence to support the verdict, the jury's findings must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury."

*Whaley v. Perkins,* at 671 (citations omitted).

The appellate courts do not make credibility determinations of the witnesses. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980). The Tennessee Supreme Court has defined "material evidence" as "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *McCall v. Bennett*, 243 S.W.3d 570, 574 (Tenn. Ct. App. 2007)(citing *Knoxville Traction Co. v. Brown,* 115 Tenn. 323, 89 S.W. 319, 321 (Tenn.1905).

This Court reviews evidentiary rulings of the trial court on an abuse of discretion standard. *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 418-19 (Tenn. Ct. App. 2004)(citing *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn.1992)). The abuse of discretion standard requires us to consider:

(1) [W]hether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of acceptable alternatives.

*Id*. at 419 (citations omitted).

Even when a trial court abuses its discretion in the admission or exclusion of evidence, the "harmless error doctrine" found in Tenn. R. App. P. 36(b) may apply. The rule sets out the doctrine:

A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

Tenn. R. App. P. 36(b).

Thus, a party claiming that a trial court erroneously allowed evidence to be admitted must show that the trial court abused its discretion in doing so. If there is a finding of an abuse of discretion, the party claiming error must also show that the admission of the evidence more probably than not affected the verdict.

The trial court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn. 2005)*; Union Carbide Corp. v. Huddleston* 854 S.W.2d 87, 91 (Tenn. 1993).

Ms. Caraway argues that the Court erred in admitting evidence and testimony concerning her financial condition including a list of her real estate holdings and the will of her mother. Counsel for the Smallman sons argued that the will was admissible under the authority of *Keith v. Murfreesboro Livestock Mkt., Inc.,* 780 S.W.2d 751, 757 (Tenn. Ct. App. 1989). In that case the court recognized that unrelated business transactions generally are not admissible unless offered to prove matters such as knowledge, absence of mistake or accident, fraudulent intent or a common scheme or plan. Counsel for the Smallmans argued that the will of Linda Caraway's mother was to be offered to show that she had a common scheme or plan to become the primary beneficiary in both the will of her mother and in the will of Raymond Smallman. Counsel for the Smallmans represented to the Court that there was a witness who could testify that Ms. Caraway was instrumental in having her mother's will made and that other family members were excluded to her benefit. The Trial Court concluded that the value of the will outweighed the prejudicial effect of the evidence and permitted the Blair will to be entered into evidence.

-10-

A witness was never called by the Smallman sons to testify and the will of Rena Blair, as well as a list of Ms. Caraway's real estate holdings, were introduced into evidence through the testimony of Ms. Caraway during her cross-examination.

The appellant takes the position the Trial Court abused its discretion when it admitted the Blair will and list of appellant's real estate holdings into evidence.  Appellant admits that the Trial Court's admission of the Blair will was based on the representation that a witness would testify regarding the Blair will and the Smallman will, and makes the argument that the Court could have corrected its error by granting her Motion to Set Aside the Verdict and Enter Judgment in Accordance with the Motion for Directed Verdict and Motion for New Trial.

We agree the Blair will was not relevant to this case.  "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have without the evidence. (Tenn. R. Evid. 401).  Relevant evidence is generally admissible while evidence not relevant is not admissible.  Rule 403 provides that even relevant evidence can be excluded if its probative value is substantially outweighed by its prejudicial effect.  The Blair will, standing alone, did not provide any information to the jury as to the issues in the case, thus it was not relevant evidence.

However, the Trial Court did not abuse its discretion when it decided to allow the Blair will testimony on representations of counsel.  When the Smallmans failed to produce the witness, the trial court had the option to instruct the jury to ignore the Blair will.  The fact that the Court did not do so, however, was harmless error. Appellant argues that the introduction of the Blair will was prejudicial because the jury would see Ms. Caraway as a "gold-digger".  There is no basis for this belief as the jury had no knowledge of the common scheme theory.  All the jury knew was that Ms. Caraway had inherited her mother's estate based on a will that had been prepared four years before Ms. Blair's death. No other information was available to the jury and there was no basis to conclude that the jury would be prejudiced against Ms. Caraway based upon that fact that she, as the sole surviving child of Rena Blair, inherited her estate.  Moreover, there was no evidence before the jury as to the extent of the estate of Rena Blair, thus there is no basis for concluding the jury would have perceived her to be a "gold-digger".

Similarly, appellant argues that the real property listed in  the exhibit lacks relevancy to the issues of this case.  She claims that the purpose for introducing the list her real estate holdings was again to portray Ms Caraway as a gold-digger, thus any probative value it might have was out weighed by its prejudicial effect.  First, we point out that whether the real estate

listed in the exhibit belonged to Ms. Caraway at all was never established at trial. Even if it is assumed that she was the owner of the property, it is unclear if she bought the property with her late husband, bought it independently or inherited it, or all of the above. The appellant's conclusion that the jury must have seen Ms. Caraway as a greedy, property hungry "gold-digger" was not established by this document. Conversely, one could consider that if the jury understood the property to be owned by Ms. Caraway, they could portray her as a wealthy woman with no need to acquire Mr. Smallman's estate. We agree with the appellant that the exhibit is not relevant evidence to the issues of the case and that the Court abused its discretion when it admitted such. However, the error was harmless as the exhibit is neither probative to the issues nor is it prejudicial.

Appellee points out that the disputed evidence was not mentioned by counsel for the Smallmans in closing argument, nor did the Trial Court address it during jury charges. Appellee cites *State v. Young*, 196 S.W.3d 85, 197 (Tenn. 2006) for its proposition that when counsel does not mention in closing argument evidence that should have been excluded by the trial court, the absence weighs in favor of a determination that no harmful error occurred.

Other than raising this issue of whether the admission of the Blair will and the Caraway real estate properties was error and a basis for new trial, appellant did not appeal the jury's findings that the lost will of Raymond Smallman should not be established and admitted to probate, that Mr. Smallman was not of sound mind at the time he executed the April 16, 2009 will and that the will was obtained through the undue influence by Linda Caraway.

The next issue is whether there is any material evidence to support the jury's verdict invalidating the marriage?

Appellant argues that was no material evidence to support the jury's verdict that the marriage was invalid. She further argues that because there was no material evidence to show Mr. Smallman was not of sound mind the day of the marriage ceremony, the Trial Court was in error when it denied her motions for a directed verdict and for a judgment not withstanding the verdict of the jury. These assignments of error are based on a determination of whether there was material evidence showing that Mr. Smallman was not of sound mind at the time of the ceremony, all three assignments are considered together.

In Tennessee, the law of marriage is governed by statute and not common law. *Coulter v. Hendricks*, 918 S.W.2d 424, 427 (Tenn. Ct. App. 1995). A marriage that has been solemnized by a ceremony according to law is presumed to be valid, and that presumption may be rebutted by cogent and convincing evidence. *Guzman v. Alvares,* 205 S.W.3d 375, 380 (Tenn.2006) (citing *Aghili v. Saadatnejadi,* 958 S.W.2d 784, 789 (Tenn. Ct. App.1997).

There is evidence that the ceremony was in accordance with the procedures set forth in Tenn. Code Ann. 36-3-103. Thus, the presumption of validity is present, and the burden of rebutting the presumption by clear and convincing evidence lay with the Smallman sons. They presented evidence showing that their father's mental function or mental capacity was substantially impaired in the days before and after the wedding ceremony. This Court, in *Brown v. Watson*, E200-401229-COA-R3-CV, 2005 WL 1566541 (Tenn. Ct. App. July 5, 2005), stated that "marriage is a civil contract, and may be voided, like any other contract, for want of sufficient mental capacity of the parties. If the mind is unsound at the time, it is incapable of consent, and that is an essential element in all contracts." *Id.* at * 1(citing *Hunt v. Hunt,* 412 S.W.2d 7 (Tenn. Ct. App.1965). There is substantial material evidence to support the jury's finding that the marriage was void due to the father's mental incapacity.

We are constrained to observe that *Coulter v. Hendricks*, 918 S.W.2d 424 (Tenn. Ct. App. 1995) distinguished a void marriage from a voidable marriage. However, this issue was not raised by the appellant at the trial level, nor on appeal. It is well settled that issues not raised in the trial court should not be raised for the first time on appeal. *Correll v. E.I. DuPont de Nemours & Co.,* 207 S.W.3d 751, 757 (Tenn., 2006)(citing *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn.1991). We will not *sua sponte* consider the issue implicit in the *Correll* Court's rationale. If we were to do so, Ms. Caraway alone would benefit and the Smallman sons alone would be harmed. Neither the judicial process, the court system nor the public would sustain injury. Moreover, under Rule 36(a), the court is required to consider if such action would provide relief to the party who had failed to raise the issue in the court below.

The main issue on appeal is whether there was material evidence to support the jury's verdict that the marriage between Smallman and Caraway was invalid. Both sides presented testimony regarding the state of Smallman's mind on or near the time of the wedding ceremony. All of the witnesses agreed Mr. Smallman's physical condition deteriorated significantly through April, May and June 2009 and that by June he was very weak and confined to his bed or couch.

The Smallman sons, Mr. Smallman's business partner and his employee Mr. Johnson testified that Smallman's mental acuity had been slipping for some time and that he was completely unable to conduct business in the last several months of his life. Also, Mr. and Mrs. Darnell stayed with Mr. Smallman the day before the wedding. They both related that he was unable to communicate with them while they were with him and that he was not himself. Mark Smallman and his wife Susie testified regarding their impressions of Smallman's mental state a few days after the wedding. They testified that he seemed to barely recognize their son and he had basically stopped communicating with the family. Jeff Smallman related that when he telephoned his father on June 21, 2009, Father's Day, his father was non-responsive, could not converse and was incoherent.

The two sides of the case presented completely opposite views regarding Mr. Smallman's state of mind around the time of the ceremony. We are required to "take the strongest legitimate view of all the evidence in favor of the verdict"; "assume the truth of all evidence that supports the verdict"; allow all reasonable inferences to sustain the verdict"; and discard all countervailing evidence". We cannot reweigh the evidence or decide where the preponderance of the evidence lies, nor can we make credibility determinations. Based upon these requirements, we hold that the record contains material evidence to support the verdict, thus, the jury's finding that the marriage was invalid is affirmed by this Court.

In sum, the Trial Court's admission of the Blair will and the real estate holdings of Linda Caraway was harmless error, and the record contains material evidence to support the jury's finding that the marriage was invalid. We affirm the Trial Court's Judgment. The cost of the appeal is assessed to Linda Caraway.

_____
HERSCHEL PICKENS FRANKS, P.J.